## ST. LOUIS SOUTHWESTERN RY. CO. v. GILLENWATER. (No. 11534.)

(Court of Civil Appeals of Texas. Fort Worth. April 3, 1926. Rehearing Denied May 15, 1926.)

1. **Master and servant** ⚌286(3)—**Railroad's duty to furnish supply store helper safe place to work held question for jury, though it was within scope of employment to keep such passageway in safe condition.**

Railroad's duty to furnish supply store helper safe place to work *held* question for jury, where at direction of foreman, he worked in passageway and was injured, though it was within scope of his employment to keep such passageway in safe condition.

2. **Master and servant** ⚌278(3)—**Evidence held to justify finding railroad had duty to furnish safe place to work to supply store helper injured in passageway.**

Evidence *held* to justify finding that railroad had duty to furnish safe place to work to supply store helper injured in passageway, though it was within scope of his employment to keep such passageway in safe condition.

3. **Master and servant** ⚌285(5)—**Whether iron plate on which railroad employee's foot caught was contributing cause of coach coupler falling on his ankle held for jury.**

Evidence *held* sufficient to take to jury question of whether iron plate on which railroad employee's foot caught causing him to slip was contributing cause of coach coupler falling on his ankle.

4. **Master and servant** ⚌287(1)—**Evidence held to require submission of issue of railroad's negligence in failing to furnish sufficient force to move coach couplers.**

Evidence *held* to require court to submit to jury issue of railroad's negligence in failing to furnish supply store helper with sufficient force of men to move coach couplers, one of which fell on such supply store helper's foot while he was moving it with the assistance of one other employee.

5. **Appeal and error** ⚌930(3)—**In determining whether it was proper for trial court to submit certain issue, appellate court must look to testimony most favorable to appellee.**

In determining whether it was proper for trial court to submit certain issue, appellate court must look to testimony most favorable to appellee.

6. **Master and servant** ⚌162—**Negligence of railroad in failing to furnish sufficient force to move coach couplers held to constitute ground of recovery.**

Negligence of railroad in failing to furnish supply store helper with sufficient force of men to move coach couplers *held* to constitute ground of recovery, where coupler fell on his ankle.

7. **Master and servant** ⚌278(21)—**Evidence held to support finding of negligence in failing to furnish help to move coach couplers.**

Evidence *held* to support finding that railroad was negligent in failing to furnish additional men to supply store helper to assist in moving coach couplers, one of which fell on such helper's ankle.

8. **Master and servant** ⚌276(2)—**Evidence held to sustain finding that negligence in failing to furnish help to move coach couplers was proximate cause of injury.**

Evidence *held* to sustain finding that railroad's negligence in failing to furnish supply store helper with additional men to assist in moving coach couplers was proximate cause of coach coupler falling on such helper's ankle.

9. **Master and servant** ⚌279(4)—**Evidence held to support finding that supply store helper's assistant was negligent in helping him move coupler.**

Evidence *held* to support finding that one assisting supply store helper in moving coach coupler which fell on latter's ankle was negligent in such work.

10. **Damages** ⚌216(3)—**Charge permitting allowance of damages for loss of time of injured railroad employee and for impaired earning capacity held proper, as not authorizing double recovery.**

Charge permitting allowance of damages for loss of time and for impaired earning capacity

---

*held* proper for injured railroad employee who lost five months' time and whose capacity to earn was greatly diminished by injury to ankle, such not being allowance of double damages.

**11. Master and servant ⚙⟹296(1)—Charge that railroad had burden of showing employee injured in aisleway was guilty of contributory negligence held proper.**

Charge that defendant railroad had burden of proof to show that employee injured in certain aisleway was guilty of contributory negligence *held* proper, though such employee knew of littered condition of aisleway, where no specific objection was made to such charge.

**12. Damages ⚙⟹132(6)—$5,094 damages held not excessive, where coach coupler fell, breaking ankle of railroad's supply store helper, resulting in partial permanent disability.**

$5,094 damages *held* not excessive, where coach coupler fell on ankle of railroad's supply store helper, breaking ankle joint, and requiring treatment for two weeks before being put in cast for four weeks, which resulted in disability estimated by doctor at 25 per cent.

Appeal from District Court, Tarrant County; R. E. L. Roy, Judge.

Action by J. E. Gillenwater against the St. Louis Southwestern Railway Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Thompson, Barwise & Wharton and F. B. Walker, all of Fort Worth, for. appellant.

S. J. Callaway, of Fort Worth, for appellee.

CONNER, C. J. This suit was filed by the appellee, J. E. Gillenwater, against the St. Louis Southwestern Railway Company of Texas for damages growing out of personal injuries which the appellee claims to have sustained while in the employ of appellant. The appellee, on May 18, 1925, filed his second amended original petition, upon which he went to trial, and as grounds for recovery alleged that on or about the 6th day of May, 1924, he was in the employ of appellant as helper at appellant's supply store at or near Hodge Station, Tex., and that his duties consisted in part of arranging and keeping in order the stock of material, supplies, and parts used in the building and repair of railroad equipment, and that while engaged in the performance of such · duties, and while under the control and supervision of appellant's foreman, he was directed by said foreman, with the assistance of another employee, to move certain coach couplers from a point in the yards of appellant to a platform which was provided for the purpose of stacking and storing said couplers, and that while moving one of them and undertaking to place it on said platform said coupler fell from said platform and struck the appellee on his right foot and ankle, causing his alleged injuries.

Appellee alleged that it was the duty of appellant to furnish him a reasonably safe place to work; that it was the duty of the appellant to furnish him a sufficient force of men to perform the work being done, and that it was the duty of the appellant to furnish him with a competent assistant; that appellant failed to fulfill its duties with respect to the appellee, as above set out—and specifically alleged negligence on the part of appellant in the following respects:

(1) That appellant was negligent in failing to furnish appellee a reasonably safe place to work, in that the aisle or passageway between the platforms on which the couplers in question were being placed was littered with cast-iron parts.

(2) That the appellant was negligent in failing to furnish to appellee a sufficient force of men to assist him in the work required of him in moving said coupler.

(3) That appellant was negligent in that it failed to furnish appellee with an able and competent helper, furnishing him instead a weak and immature minor.

(4) That appellee's fellow workman, Glenn Norman, an employee of appellant who was assisting appellee in moving said coupler, was negligent, in that Glenn Norman carelessly and negligently let go or turned loose of said coupler, and permitted the same to topple and fall over on appellee.

Appellee, as a proximate result of said alleged negligence, asked for damages in the sum of $5,094.

The above and foregoing allegations constitute the material allegations of the appellee as made by the pleadings on which he went to trial.

Appellant, in its second amended original answer, after a general demurrer and certain special exceptions, pleaded a general denial and, in addition, pleaded that such damage as the appellee may have sustained was caused by his own negligence in continuing in the employment of appellant after having full knowledge of the littered and dangerous condition of the aisleway.

The case was submitted to the jury on special issues, and the jury found, in response to the issues submitted, that appellant was negligent (1) in failing to furnish appellee a safe place to work, (2) in failing to furnish appellee a reasonably sufficient force of men to assist him in doing the work required, and (3) that the colaborer, Glenn Norman, was guilty of negligence, and that each act of found negligence proximately contributed to appellee's alleged injuries.

All issues of contributory negligence were answered against the appellant, and appellee's damages were assessed at $5,094, the amount for which he sued. Upon the verdict of the jury judgment was rendered by the court on May 25, 1925, in appellee's favor for the sum of $5,094, the amount for which he

⚙⟹For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

sued. From this judgment the defendant has duly prosecuted an appeal, assigning error to various proceedings, as will hereinafter more clearly appear.

[1,2] By demurrers to appellee's petition, by exception to the court's charge, and otherwise, appellant insists that it was under no duty to furnish appellee a safe place to work, inasmuch as appellee was employed to systematize its warehouse and parts department and make the place safe and in a suitable condition for appellee's engagements. Appellee's testimony relating to his employment and the character of his duties was substantially as set out in his petition, as hereinbefore briefly given.

In the case of Allen v. G., H. & S. A. Ry. Co., 14 Tex. Civ. App. 344, 37 S. W. 171, the San Antonio Court of Civil Appeals uses this language:

"Ordinarily, the master owes ·his servant the duty of inspection or reasonable care in furnishing him safe and suitable means for performing his work. This rule has no reference to the safety and condition of the thing the servant is employed to repair or complete. As stated in Carlson v. Railway Co. [21 Or. 450] 28 P. 497: 'Where a servant is employed to put a thing in a safe and suitable condition for use, it would be unreasonable and inconsistent to require the master to have it in a safe condition and good repair for the purpose of such employment.'"

In the case of G., C. & S. F. Ry. Co. v. Drennan (Tex. Civ. App.) 204 S. W. 693, this court said:

"According to plaintiff's testimony, if the hole or space had not been covered by the sliding top pieces of lumber, he would not have fallen therein. There is no proof that, as a result of switching, the lumber in such cars had previously so slidden as to cover the spaces between the tiers in such a manner that they could not be seen by persons unloading lumber while exercising ordinary care for their safety. The injury was due to one of the transitory changes in the handling of the lumber, and the general rule requiring the master to furnish the servant a safe place to work was not applicable, since it would be entirely unreasonable to say that the master owed plaintiff the duty to inspect each car of lumber before he undertook to unload it in order to avoid injury to him from such causes as those. Armour v. Dumas, 43 Tex. Civ. App. 36, 95 S. W. 710, and authorities cited."

This court also had occasion to consider the rule invoked in behalf of appellant in the case of Magnolia Petroleum Co. v. Ray (Tex Civ. App.) 187 S. W. 1085, where, in an opinion by Mr. Justice Dunklin, it was said:

"In many of the authorities announcing that the general rule requiring a master to furnish a safe place for the servant to work does not apply in such cases, it is stated that the servant assumes all such risks. The underlying principle of the exception, as we understand it, is that no negligence can be charged to the master when the servant voluntarily contracts to assume the very risk of which he complains; and, in the absence of negligence on the part of the master, the servant has no cause of action as a matter of course. The use of the expression in the authorities referred to, that the servant assumes the risk, is misleading, in that the defense of assumption of risk implies negligence on the part of the master creating liability for the damages sustained, unless such a right of action is destroyed by that defense. It is important to keep this distinction in mind, if the common-law rule of allowing the defense of assumed risk where the master has been guilty of negligence is changed by statute, as has been done in this state, and if that statute applies in the present suit. If there has been no negligence on the part of the master, then the defense of assumed risk has no place in the case."

Many other cases of like import might be cited to illustrate the general rule, but we think the case before us is distinguishable from those cited. As pertinent to the question under consideration, appellee's testimony, in substance, was to the effect that on the day of the accident he, together with his helper, Glenn Norman, were directed, in the process of cleaning up the depot supply yard, to remove certain couplers from an older platform to one newly erected; that the platforms were about 20 to 30 feet long, 4 feet wide, and 12 inches high, extending in the same general direction with a 4-foot passageway between the platforms; that the aisle or passageway was littered with pieces of detached material kept on hand for the repair of the cars, locomotives, etc., such as iron bolts and other small articles; that the car couplers they were engaged in transferring were coach couplers consisting of an iron shank or stem some 60 inches long and 4 to 6 inches square, upon the end of which was attached a knuckle or coupling arrangement some 12 inches long and 10 inches thick, the whole weighing some 350 pounds. The method of moving the couplers was by extending a board from one platform to another and standing the coupler upright and "walk" it across the plank. By "walking" was meant that the coupler was stood on the larger end, as we infer, and then moved first one way and then the other. The evidence warrants the conclusion that the helper, Glenn Norman, at the time of the accident was some 16 or 17 years of age and weighed about 130 pounds; that 'he was strong for his age and had been in the employ of appellant some week or two, and before the day in question he and appellee had moved "car couplers," which were smaller and lighter than coach couplers, from one platform to the other; that on the occasion of the accident they had succeeded in moving the coach coupler from the old platform to the new one, and within about 12 inches from its destination, when, as appellee testified, it could not be moved further without displacing some obstructions on the platform, and that he let loose of the coupler standing upright and stepped down into the passageway; that as he did so and just as he was turning his

body to take hold of the coupler and move it forward, he saw it falling toward him; that he threw his body back, but in doing so his foot caught or slipped on a piece of iron some several inches wide with a flange extending up at right angles, and thus prevented from withdrawing his right foot soon enough and the coupler fell upon and injured it.

Glenn Norman testified to the effect that he was holding the coupler upright, and that when appellee got down into the aisle or passageway he took hold of the coupler and pulled it on himself. This action was denied by appellee, who affirmed that he never touched the coupler at all after he descended into the passageway

The evidence undoubtedly tends to show that it was within the scope of appellee's employment to keep the passageway between the platforms in a safe condition, but in relation to this he testified:

"Yes, sir; I know what those aisles between the platforms were put there for. They were put there for a passage—a passage for them to walk through to get this material off of the platforms. The material hadn't yet been placed on the platform. It would have been just as easy, just as handy for the company, from the company's standpoint, to have put this stuff up out of the way and to give passage in those aisles, and particularly this one, as it would to have taken it up later after having walked over it. This aisleway in which I got hurt was between No. 1 and No. 3 platforms. Both No. 2 and No. 3 platforms were entirely new. This material that was there in the aisle was placed there just a few days before. It was brought from about 60 feet north of there, off of an old platform, in the same yard. It was just piled in there irregularly. This stuff that was in the aisleway was to be placed on some of those platforms as a permanent place. All that was in this aisle was to be placed on those two platforms. It was to be placed on those two platforms that we were working on with these couplers.

"We did not proceed to clean up those aisleways and place that stuff before moving the heavy pieces because the foreman wouldn't let us. I offered to do that. I talked to the foreman about doing that. He said he didn't have time to fool with it; that he had it lined up this other way and that is the way he wanted it to go. Yes, sir; he had it on the book the other way. Yes, sir; he directed me each morning in regard to stacking this."

We think the evidence just quoted distinguishes it from the cases cited in behalf of appellant. It will be observed that appellee was not engaged in cleaning up the aisleway, but engaged in a work which apparently, at least, made it entirely proper for him to use it, and, if appellee's testimony is to be credited, he was expressly required to proceed to move the coach couplers without cleaning up the aisleway. The direction of the foreman was that of the master, and we see no reason why the evidence did not at least raise the issue and render it proper for the court

to submit to the jury the issue under consideration. We are further of the opinion that, in so far as it may be pertinent, the jury was justified under the evidence in determining the issue against appellant.

The case of Mosher Mfg. Co. v. Boyles, 62 Tex. Civ. App. 636, 132 S. W. 492, was one in which a servant, employed by a large steel and iron manufacturing concern, was working about and among the material piled on a storage yard, and he was ordered to pick up scraps of iron between piles of steel beams, and the court held that the master was required to exercise reasonable care to make the place safe for the servant to work, and that where the beams were unsafely piled and the servant was injured in consequence of the condition of the beams the master was liable. In disposing of the case, the court, among other things, said:

"We are also of the opinion that the 'safe place rule' was clearly applicable under the evidence, and that it cannot be said as a matter of law that plaintiff assumed the risk of the danger in going between the piles of beams to pick up the scraps of iron. He was not engaged, with the members of the yard gang, in taking down and restacking the piles of beams situated in the yard. On the contrary, he was engaged in an entirely different character of work, namely, picking up scrap iron and placing it in piles to itself, which was lying scattered over the yard. This work of itself was not dangerous, while that of taking down and restacking the beams would be attended, perhaps, with more or less danger. The beams that were being taken down and restacked were in separate stacks, and only one stack being taken down at a time. The stack that fell upon plaintiff was not being taken down or restacked or otherwise being interfered with at the time it fell, and hence the condition of the place at which plaintiff was injured was not undergoing any change with respect to the pile of beams or otherwise by the work of the yard gang or his own work at the time he was injured that necessarily endangered to any extent his presence there. Under the circumstances shown, it was the duty of the defendant to exercise ordinary care to furnish plaintiff a reasonably safe place in which to work, and a failure to do so was negligence. Whether the beams were improperly and unsafely piled, and the danger of their falling obvious, or whether plaintiff had an equal opportunity with the defendant to know the condition of the pile of beams, were questions of fact, and all fully and clearly submitted either in the court's general charge or special charges requested by the defendant."

Other cases perhaps illustrative of the question are as follows: H. & T. C. Ry. Co. v. Long (Tex. Civ. App.) 219 S. W. 212; Memphis Cotton Oil Co. v. Gardner (Tex. Civ. App.) 171 S. W. 1082.

[3] Appellant urges that the detached piece of iron, which appellee testified that his foot caught and caused him to slip, could not be a proximate cause of the injury, but we think the evidence such as to raise the issue and make it a question for the jury to

determine whether or not the iron plate was a contributing cause. So that, on the whole, the controlling question relating to the point under discussion was embodied in the issue submitted by the court to the jury of whether appellee was guilty of contributory negligence in continuing his employment with knowledge of the condition of the aisleway, and this issue was determined by the jury in appellee's favor.

[4] Appellant further insists that "there is no evidence in this case showing or tending to show that appellant was guilty of negligence in failing to furnish to the appellee a reasonably sufficient force of men to do the work in which he was engaged," and that "there is no evidence in this case showing or tending to show that any failure upon the part of this appellant to furnish the appellee a reasonably sufficient number of men to move the couplers caused the injury," and that hence the court erred in submitting these issues.

There was evidence tending to show that prior to the occasion in question the appellee and his helper, Glenn Norman, had moved a number of car couplers from the old platform to the new, but it is not clear that they had theretofore moved any coach couplers, which were heavier, and when appellee was directed by the foreman to proceed to move the coach couplers, he testified that:

"I asked him (the foreman) if he were going to get any help and he said no to go ahead and do the best that we could, that he couldn't get any help that morning, but to go ahead and do the best that we could,"

—and that on a former occasion when some of the coach couplers had been moved—

"There were four men worked at the job of moving them. * * * Another man worked in the job that I was working in, at the time they were moved the second time. There were two other men brought in to help us; they were roundhouse laborers. Mr. Harvey sent for them. Mr. Harvey was the foreman at that time."

After giving the dimensions of coach couplers, the foreman, Harvey, testified:

"I can lift one end of them. I can lift either end. No, I could not carry one easy; I say you could carry one end of it, but that is not the way to handle them, pick it up and carry it. When they stand up on the heavy coupler end they do not stand straight up, they stand at an angle, * * * about 20 degree angle, I guess. In attempting to walk one of those things you would lean it the way it was angling; all you have got to do is pull it over just a little further, about three or four inches further at the top and then walk it; if you want to you can lean it back the other way and it will walk a little faster. You lean it to you when you perform that. You would have to lean it a little further to you than its natural incline in order to walk it."

He further testified to the effect that two men were sufficient to move a coach coupler from one platform to another; and the helper, Glenn Norman, testified that he could lift one of the car couplers himself; that he had done so.

[5-8] In determining the question as to whether it was proper to submit 'the issue, we must look to the testimony most favorable to appellee, and, so considering his testimony as above quoted, we think the court was so required. If in fact the master was guilty of negligence in the failure to furnish a sufficient force of men, there can be no doubt but that such negligence constitutes a ground for recovery. See G., H. & S. A. Ry. Co. v. Bonn, 44 Tex. Civ. App. 631, 99 S. W. 413, writ of error denied; S. A. Traction Co. v. Rodriguez (Tex. Civ. App.) 77 S. W. 420. We do not feel that we can say that the evidence is insufficient to support the finding of the jury on the issue of appellant's negligence in a failure to furnish additional men, or that the finding of the jury to the effect that such negligence was the proximate cause of appellee's injury must be set aside for want of evidence sufficient to support it. We think the evidence on the whole authorized the conclusions announced by the jury in their findings.

[9] Appellant further urges that there is no evidence in this case showing that Glenn Norman was guilty of negligence in letting go of the coupler, or, if so, that it was the proximate cause of appellee's injury, and hence that the court erred in submitting these issues. As already stated, the evidence shows that Glenn Norman was 16 or 17 years of age, had been at work on the yard not to exceed two weeks, that he weighed 130 or 140 pounds, and appellee testified that he thought he was as strong as he, appellee. Glenn Norman further testified to the effect that he did not request appellee to get down into the aisleway; that he was holding the coach coupler upright; that he did not turn it loose, but that on the contrary appellee himself took hold of the lower part of the coupler and in an attempt to move it pulled it upon himself. Appellee, on the contrary, testified that it became necessary for him to get into the aisle in order to move the coupler into the place where they had been directed to place it; that as he turned to descend he let entirely go of the coupler; and that as he was in the act of turning his body toward it after descending he saw it falling toward him; that he did not see his helper at the time. He was unable to state what Glenn Norman did or failed to do, but we think the jury was authorized to conclude that Glenn Norman was of sufficient strength to hold the coupler upright, and that in the exercise of due care he should have done so. The jury were not compelled to believe Glenn Norman's statement, and could conclude that his youth, immaturity of mind,

and inexperience in the work in which he was engaged rendered him less careful and less attentive than was required under the circumstances, and hence that by failing to maintain a sufficient hold upon the shank of the coupler, or by permitting it to lean too far away from him, he was guilty of negligence.

[10, 11] The charge of the court is attacked in two respects: It is insisted that the court erred in his charge, in that it permitted the jury to assess damages "for loss of time and for impaired earning capacity up to the time of the trial, because such items necessarily cover one and the same thing, and the charge therefore authorized the jury to assess double damages against this appellant."

It was further insisted that the charge was erroneous, in that the court placed the burden of proof upon appellant to establish by a preponderance of the evidence "that the appellee was guilty of contributory negligence in continuing to work with a knowledge of the condition of the aisleway, because appellee's own evidence established prima facie that he was guilty of negligence, testifying as he did that he knew the danger, and hence, such being true, the burden was upon the appellee to free himself of negligence by a preponderance of the evidence."

In the case of Knittel v. Schmidt, 16 Tex. Civ. App. 7, 40 S. W. 507, writ of error denied, it was held that the jury in estimating damages might consider "loss of time and diminished capacity to labor," and that a charge of that purport was not objectionable as allowing a double recovery for the same injuries where the court also instructed, as is true in this case, that the jury were to allow such damages as seems right and proper. Judge Williams wrote the opinion in that case, and we think he satisfactorily showed that loss of time is one thing and a diminished capacity to labor is another, and we shall not attempt to enlarge upon what he said upon the subject. In this connection, it may be pertinent to say that appellee's evidence is to the effect that he lost as much as five months' time after his injury, and that his capacity to labor had been greatly diminished, and the physician who attended him testified to the effect that in his judgment appellee's capacity for continued labor was about 25 per cent.

As to appellant's objection to the court's charge on the burden of proof as stated in its twelfth proposition, we think it sufficient to say that the general rule without doubt is as stated in the court's charge, and while it is true, as asserted, that appellee testified that he knew of the littered condition of the aisleway between the platforms and in a general way knew that it was more or less dangerous to work there in that condition, yet he testified that he did not realize the hazard or anticipate any injury therefrom such as resulted or an injury of similar character. And no inquiry appears to have been made into the financial condition of appellee, as to his burdens in the way of family or other dependents, or other necessities that would tend to impel appellee to continue in his employment notwithstanding the knowledge he had of the condition of the aisleway. There is no evidence relating to these subjects. Moreover, while appellant made numerous objections to the court's charge and to the issues submitted, it does not appear that the specific objection presented in appellant's proposition and here discussed was made. So that we do not feel prepared to say that his evidence on the subject was of the character to render the rule invoked applicable.

[12] A further contention is that the verdict of the jury is excessive. We have carefully considered the evidence, and the question is so largely one for the jury that we do not feel able to sustain the contention.

The testimony was to the effect: That the iron coupler fell upon the ankle of appellee's right foot. That when it hit his foot it rolled off, but that he did not get up. That others ran to him and picked him up, called an ambulance, and took him to the Baptist Hospital and called Dr. Jeter, the company physician, who said that he could not do anything with it, but that he would have to be sent to Texarkana to the company's hospital. That his foot was hurting him very much. That it was all "mashed up and hardly looked like a foot it was so swollen." That "it was paining all up my right leg." That Dr. Jeter examined his foot and bound it up with gauze. That he stayed at the Baptist Hospital some 24 hours, when he was treated by other doctors, including his family physician. That they put his foot back in place, but could not put a cast on it to hold it. That it was swollen and mashed and bruised up to where they could not put a "plaster form" on it to hold it, but they did straighten it up and put the bones in place. That he then went home, and they placed two sacks of sand on each side of his foot and leg; that he lay in that position from the 6th to the 18th of May, 12 days. That on the 18th day of May they put his foot in a plaster cast. That his physician continued to treat him every day. That they made X-ray pictures of his foot. That they put it in a plaster of paris cast, and it remained in that cast 6 or 7 weeks. That it was some two or three weeks before he could get out into the yard with his crutches. That it was "something like five months" before he went back to work at all. That during that period he "could not do any sort of work." That thereafter he tried to work for an elevator unloading grain for three days, when he quit because he could not stand on his foot "to do the work; it would swell; it swelled to where I could not

284 S.W.—18

wear my shoes." That he was then confined to his home for two or three days before he worked again. That in a week or ten days thereafter he took a job with Armour & Co. wrapping meat. That he was compelled to stand up. That he worked about ten days, but had to quit on account of his foot. That his foot pained him most all of the time; it would swell up so he could not wear his shoe. "Yes, sir; it hurt me at night." That he next went to the cotton patch out near Newark; that he did fairly well, as he did not have to stand on his foot. That during the fall and winter he worked at most anything he could get to do. That he was a carpenter by trade, and had been working at this trade since. That his foot is not well "at this time; it is partly stiff and affects me to step on anything; it is just like sticking a knife in me." That it hurt right up into his ankle. That it interfered with him in performing his duties as a carpenter. That he could climb a ladder, but had to use his toes in climbing; that he could not stand on his foot; that he could not put the middle of his foot on the round of the ladder, and could not work on a ladder. That a carpenter in general work is required to do that "quite a bit." That he could work shingling a house where he could be seated and did not have to use his foot. That the condition of which he spoke "causes me much pain; well, any time that I step on anything that strikes me there causes me severe pain; it does not pain me but very little to walk across the floor here, just walking across for a short distance; of course if I walk any distance why it goes to paining in my ankle." That no bones were broken, but they were out of joint. That there were no cuts on the outside of his foot, but it was "all bruised and bloodshot; it turned a greenish black color."

Dr. Rumph testified, stating his qualifications and experience and his acquaintance with the appellee, and that when he was called upon to attend him he gave appellee first aid, did his foot up in a temporary splint, boards on either side, and that it was pretty badly swollen and some discoloration. That he and another physician took X-ray pictures of it, but no bones were broken in the ankle. That the pictures "showed that the ankle joint had been bursted—that is, the ligaments that hold the joint—the foot fell over to one side, these bones seemed to come apart just a little bit, and this bone seemed to be twisted; in other words a badly sprained ankle—bursted up ankle. * * * It was very painful and very badly swollen. We put it in dressing for I think about a week or ten days, possibly two weeks. * * * I then put a plaster cast on it. * * * The tissues were torn badly. By the external jam all the ligaments in the joint were torn so it caused considerable swelling and pain. By tissues I mean the ligaments. After about ten days or two weeks, after the swelling had subsided sufficiently, I put it in plaster of paris cast from the knee down. I kept it in there I guess four or five weeks, three or four anyway. During that time he was confined to his home mostly. * * * I think it was along in August, the latter part of the summer, before I took it off. In a tearing up of the ligaments like that there is a question as to whether they ever repair completely; that is, ever have as strong a joint again. * * * The average rule, though, is that they would be as strong as ever; the average broken bone will heal and reunite and become permanently as strong as it was before more often than the kind of an injury that Mr. Gillenwater had would. * * * The torn ligament is likely to be the more painful than a broken bone on account of there being more nerve tissue destroyed. His ankle is somewhat enlarged, elicited considerable pain on pressure just inside the heel. * * * Mr. Gillenwater's ankle and foot is permanently injured to some extent. It would be kind of hard for me to say just what percentage of disability you would get there. Yes, I observed some stiffness in it, some lack of motion; the motion is not as free in that ankle as it is in the other one. * * * I imagine that I would estimate his disability at about 25 per cent. * * * The enlargement I guess is about all the objective symptoms Mr. Gillenwater has right now upon that ankle. * * * By objective symptoms I mean those you observe. * * * The 25 per cent. disability that I speak of is an estimate on my part. One doctor might give him 25, another give him 50, or 10."

Several other incidental questions are presented, but we find nothing that we think necessary to discuss, and conclude that all assignments as limited by their propositions should be overruled and the judgment affirmed.